**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **AUTOBYTEL, INC.** | § | |
| **Plaintiff** | § | |
| | § | |
| **vs.** | § | |
| | § | **CASE NO.   2:04-CV-338** |
| **DEALIX CORPORATION** | § | |
| **Defendant** | § | |

## MEMORANDUM OPINION AND ORDER

This Claim Construction Opinion construes terms in U.S. Patent No. 6,282,517 ("the '517

patent").  Also before the Court is Autobytel, Inc.'s ("Autobytel") Motion to Strike the Korth

Declaration (Docket No. 45).  The Court will first discuss its claim construction and then address

the motion to strike.

## BACKGROUND

Autobytel alleges that Dealix Corporation ("Dealix") infringes the '517 patent.  The '517

patent discloses a method and apparatus to allow a potential automobile purchaser to create and

submit a purchase request for a new or used automobile over a computer network.  The patent

discloses a Data Center system that consists of a system database, a buyer interface, and a dealer

interface.  The potential buyer submits a purchase request to the Data Center system via the buyer

interface, wherein the Data Center system creates a purchase request record.  The purchase request

record is then stored in the appropriate dealer's exclusive database region where it is made available

to that dealer via the dealer interface.

## APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to

1

which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *See id.*; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). This intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id*. Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id*. Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314-15.

Claims "must be read in view of the specification, of which they are a part." *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325

(Fed. Cir. 2002).  This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316.  In these situations, the inventor's lexicography governs.  *Id*.  Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone."  *Teleflex, Inc.*, 299 F.3d at 1325.  But, "although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims."  *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998); *see also Phillips*, 415 F.3d at 1323.  The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent.  *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'"  *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862).  Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent.  *Id*. at 1318.  Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court.  *Id*.  Generally, extrinsic evidence is "less reliable than the patent and

3

its prosecution history in determining how to read claim terms." *Id*.

The patent in suit also contains means-plus-function limitations that require construction. Where a claim limitation is expressed in "means plus function" language and does not recite definite structure in support of its function, the limitation is subject to 35 U.S.C. § 112, ¶ 6. *Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In relevant part, 35 U.S.C. § 112, ¶ 6 mandates that "such a claim limitation 'be construed to cover the corresponding structure . . . described in the specification and equivalents thereof.'" *Id*. (citing 35 U.S.C. § 112, ¶ 6). Accordingly, when faced with means-plus-function limitations, courts "must turn to the written description of the patent to find the structure that corresponds to the means recited in the [limitations]." *Id*.

Construing a means-plus-function limitation involves multiple inquiries. "The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Once a court has determined the limitation's function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Id*. A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id*. Moreover, the focus of the "corresponding structure" inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id*.

# THE '517 PATENT[1]

## *Purchase request*

The Court agrees with Autobytel's proposed construction and construes the term as "information concerning a potential purchase transaction submitted by a potential buyer and received by a Data Center system." Dealix argues that the term should be construed with the limitation that a purchase request must go directly from a potential buyer to the Data Center system. Dealix cites various excerpts from the specification in support of its argument. *See, e.g.,* Col. 5:9-36, Col. 6:31-33, Col. 7:24-25, Col. 13:37-40. Autobytel contends that the claim language and specification both contradict Dealix's proposed construction. Claim 1 requires, "receiving said purchase request over a computer network from a potential buyer," and Autobytel argues that no limitation is placed on the purchase request requiring it to go directly from the potential buyer to the Data Center system. Col. 18:9-10. Autobytel also points to the language in claim 2 that states, "wherein said act of receiving said purchase request comprises receipt of a request that is transmitted through a plurality of web pages" arguing that because the purchase request can go through a "plurality of web pages" it is not limited to traveling directly from the potential buyer to the Data Center system. Col. 18:30-32. Furthermore, Autobytel points to Column 7, lines 7 to 9 of the specification, which states "[i]n yet another embodiment, the potential buyer may also submit a vehicle purchase request from the third-party computer" arguing that a purchase request does not have to come directly from the potential buyer's computer.

The Court is persuaded by Autobytel's arguments. Claim 2 claims a method for receiving a purchase request through a plurality of web pages. To prevent claim 2 from being superfluous,

---

[1] Appendix A contains the relevant claims of the patent with the disputed terms in bold.

claim 1 is differentiated in that a purchase request under claim 1 is not transmitted through a plurality of web pages.  However, nothing in the claim language or specification prevents a purchase request under claim 1 from traveling through some other type of computer network, one not employing a plurality of web pages, in an indirect path between the potential buyer and the Data Center system. Accordingly, the Court does not construe purchase request with the limitation that it must travel directly from a potential buyer to the Data Center system.

### Data Center system

The parties and the Court agree that the term should be construed as "the system defined by the claims of the patent-in-suit."

### System database

The Court modifies Autobytel's proposed construction and construes the term as "a database in the Data Center system."  Dealix argues that the term should be construed as "a collection of related data stored in one or more computerized files in a manner that can be accessed by users or computer programs via a database management system used by the Data Center system."  Dealix's proposed construction comes from the IEEE Dictionary's third listed definition of "database." Dealix argues that the "ambiguous and sometimes contradictory way in which the patent specification refers to the system database and the Data Center Programs in relation to the storage medium 106" requires extrinsic evidence to provide a proper construction to the term.  Autobytel contends that Dealix's construction is too limiting and proposes that the term should be construed as "a database associated with the Data Center system."  Autobytel relies on the specification's discussion of the system database, which is shown as storage medium 106 in Figure 1, *see* Col. 6:43-54, and particularly the portion that states, "In an alternative embodiment, the database may conform

6

to any database standard, or may even conform to a non-standard, private specification." Col. 6:45-47. Autobytel contends that the specification supports a wide variety of database implementations and is not limited to the use of a database management system.

The Court agrees with Autobytel that there is no need to look to extrinsic evidence such as dictionaries to construe the term. Furthermore, the Court agrees that the specification supports a wide variety of database implementations and is not limited to the use of a database management system. However, the Court does not agree with Autobytel that the database is simply "associated" with the Data Center system. The Court agrees with Dealix that the word "system" is a reference to the Data Center system. Accordingly, the Court construes the term such that the database is "in" the Data Center system.

### Buyer interface

The parties and the Court agree that the term should be construed as "a hardware/software module used by a potential buyer to submit a purchase request to the Data Center system."

### Dealer interface

The Court agrees with Autobytel's construction and construes the term as "a hardware/software module used by a dealer to access the Data Center system." Dealix argues that the term should be construed as a "mechanism through which a dealer accesses his exclusive database region of the system database." During the *Markman* hearing, Dealix agreed to "hardware/software module" in place of "mechanism." However, Dealix still argues that the specification and claim language indicate that the module gives the dealer access specifically to his exclusive database region as opposed to the Data Center system in general. In support of its argument, Dealix points to language in the specification that states, "The dealer access module 612

7

provides a dealer an interface into the Data Center system. . . . More particularly, a dealer may directly access its exclusive database region, and the information contained therein, by logging into the Data Center system through the dealer access module 612." Col. 17:37-44. Autobytel argues that this same language from the specification supports its construction. Specifically, Autobytel points to the first sentence of the section cited by Dealix, which states the dealer has access to the Data Center system. Col. 17:37-38. The second sentence, which Dealix relies on, does not express a limitation of the dealer's access, but clarifies how the dealer gains access to its exclusive database region. Autobytel contends that this first sentence cited by Dealix sufficiently describes the "dealer interface" and that inclusion of the term "exclusive database region" only adds unnecessary confusion because the Court is separately construing that term. The Court is persuaded by Autobytel's arguments and construes the term in accordance with Autobytel's proposed construction.

### Remote interface

The parties and the Court agree that the term should be construed as "interface to provide remote access to the Data Center."

### Immediate access

The parties and the Court agree that the term should be construed as "the ability of the buyer interface and dealer interface to immediately find and go to a database."

### Computer network

The parties and the Court agree that the term should be construed as "two or more computers interconnected to enable communication among them."

*Exclusive database region*

The parties and the Court agree that the term should be construed as "the collection of all purchase request records in the system database associated with a particular dealer for its exclusive access."

*Direct access*

The parties and the Court agree that the term should be construed as "the ability of a computer to find and go straight to a particular storage location in memory or on disk to retrieve or store an item of information."

*Product identification data*

The Court modifies Autobytel's construction and construes the term as "information displayed to and/or submitted by a potential buyer that identifies a product sought to be purchased." Dealix contends that the term should be construed as "information submitted by a potential buyer to the Data Center system that identifies a product sought to be purchased." Dealix argues that there is no support for construing the term in such a way that product identification data can be both displayed to and submitted by a the potential buyer.

Autobytel contends that the term should be construed as "information submitted by and displayed to a potential buyer that identifies a product sought to be purchased." Autobytel argues that Dealix tries to limit the term's construction to exclude the embodiment in which information can be display to a potential buyer. Autobytel points to Column 7, lines 6 to 9 of the specification to support its argument that in one embodiment product identification data is displayed to a potential buyer. *See* Col. 7:6-7. The Court is persuaded by Autobytel's argument and agrees that the claim language should not be limited to exclude the embodiment in which identification data can be

displayed to a potential buyer. However, the claim language does not require that information be displayed, and the Court will not construe the term in such a manner. Therefore, the Court modifies Autobytel's proposed construction so that information can be displayed to, "and/or" submitted by, the potential buyer.

*Buyer location information*

The parties and the Court agree that this term does not require construction.

*Creating a purchase request record*

The parties and the Court agree that this term does not require construction.

*Communicating said purchase request*

The parties and the Court agree that this term does not require construction.

*Displaying*

The parties and the Court agree that this term should be construed as "making visible."

*Refreshing*

The parties and the Court agree that this term should be construed as "updating information on a display."

*Immediately*

The parties and the Court agree that this term does not require construction.

*Web page*

The parties and the Court agree that this term should be construed as "a collection of data formatted in a markup language with hypertext capabilities."

*Server that is remote to the identified dealer*

The parties and the Court agree that this term should be construed as "server distant from the

dealer.  Server: a device or computer system that is dedicated to providing specific facilities to other devices attached to the computer network."

*Entry system*

The parties and the Court agree that this term should be construed as "hardware/software module that enables the input of information."

*Provides at least a first web page to said buyer*

The parties and the Court agree that this term should be construed as "hardware/software module that produces the web page through which a potential buyer creates and submits a purchase request."

*Dealer management system*

The parties and the Court agree that this term should be construed as "hardware/software module that enables a dealer to manage information."

*Remote access*

The parties and the Court agree that this term should be construed as "access from a physically distant computer."

*Immediately storing [said purchase request record]*

The parties and the Court agree that this term does not require construction.

*Formulating*

The parties and the Court agree that this term should be construed as "creating."

*Logically connecting*

The parties and the Court agree that this term should be construed as "establishing a link between."

*Purchase request record*

The Court modifies Autobytel's proposed construction and construes the term as "a collection of fields populated by dealer information and buyer information." Dealix argues that the term should be construed as "purchase request formatted for entry into the system database." Dealix contends that there is no intrinsic support for Autobytel's construction and that the Court must turn to extrinsic evidence to construe the term. However, Autobytel contends there is intrinsic evidence, specifically the specification, that supports its construction of purchase request record as "a collection of fields populated with dealer information and validated buyer information." Autobytel argues that the dealer information is part of the purchase request record. To support this conclusion, Autobytel looks to the specification, which states, "The Data Center system receives the purchase request information from the buyer and determines an appropriate seller to receive the purchase request. The Data Center then proceeds to create and store the appropriate purchase request record in the database region exclusively assigned to the seller." Col. 3:5-9. Autobytel contends that this language illustrates that the record must include dealer information if it is to be directed to the appropriate seller. Autobytel also points to the specification's description of Figure 7 as an example of a purchase request record that includes dealer information. *See* Col. 11:9-18. The specification describes "a set of information fields comprising a new vehicle purchase request record according to one embodiment of the invention" and lists "dealer identification number" as one of the items found in said purchase request record. *See id.* The Court is persuaded by Autobytel's argument and agrees that the term should be construed to include both dealer information and buyer information. However, the Court does not agree with Autobytel that the word "validated" or "checked" should modify buyer information.

Autobytel cites language from the specification that states, "Once the buyer information is entered, the Data Center moves to a step wherein a check is performed to determine if the buyer has previously submitted a new vehicle purchase request within the previous 48 hours."  Col. 15:47-50. Dealix argues this language only demonstrates that one embodiment of the invention includes a step for checking to see if a potential buyer has previously submitted a request and does not justify adding a "validated" or "checked" modifier to buyer information.  The Court agrees with Dealix that there is no other mention of any other buyer information being validated or checked in the patent. Accordingly, neither term should be included as a limitation to buyer information in the construction of purchase request record.

### Identified number

The parties and the Court agree that this term does not require construction.

### Means for receiving a purchase request

The parties do not dispute that this limitation should be construed as a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6.  The Court agrees with Autobytel and construes the function as "receiving a purchase request over a computer network."  Dealix argues that the function should be construed as "receiving a purchase request over a computer network from a potential buyer." Dealix contends that the phrase "from a potential buyer" is part of the function and that the function is incomplete without this phrase.

The Court's construction of "purchase request" does not include the limitation that the purchase request must come directly from a potential buyer.  As discussed above, Autobytel points to the language in claim 2 that states "wherein said act of receiving said purchase request comprises receipt of a request that is transmitted through a plurality of web pages" arguing that because the

purchase request can go through a "plurality of web pages" it does not have to travel directly from the potential buyer to the Data Center.  *See* Col. 18:30-32.  Again, the Court is persuaded by Autobytel's argument.  A purchase request is not limited such that it must come directly from a potential buyer.  Likewise, the means for receiving a purchase request should not be limited such that a purchase request must come directly from a potential buyer.  A construction limiting the means for receiving a purchase request in such a manner would create an inconsistency in the Court's claim construction.

The Court also agrees with Autobytel and construes the corresponding structure as "Data Center server (element 104 in Figure 1 and components of the server illustrated in Figure 6 including elements 602  buyer access module and element 604 process purchase request module and 612 network access module) working in conjunction with buyer computers (element 116/118 in Figure 1) to execute a computer program implementing at least the steps as shown in Figure 10."  Dealix's proposed corresponding structure is nearly identical to Autobytel's with one exception.  Dealix's parenthetical description of the Data Center server begins with "Data Center server (element 104 in Figure 1 and Gateway (element 110 in Figure 1) and components of the server . . . ."  Dealix's construction adds "gateway" to the corresponding structure based on its presence in Figure 1. Throughout the specification, Figure 1 included, "gateway" is only present as a component to "*one* embodiment" of the invention.  *See* Col. 3:52-53, Col. 6:1-8 (emphasis added).  There is no indication that "gateway" is a part of the only embodiment.  Furthermore, no language in the specification suggests that "gateway" is a necessary structure to perform the recited function. Accordingly, the Court does not include "gateway" in its corresponding structure.

14

*Means for comparing said product identification data and said buyer location information*

The parties do not dispute that this limitation should be construed as a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6.  The Court agrees with Autobytel and construes the function as "comparing said product identification data and said buyer location information."  Dealix argues that the function should be construed as "comparing product identification data received from a potential buyer with buyer location information received from a potential buyer."  This construction adds "received from a potential buyer" to the language spelled out in the claim.  Dealix's only argument for including this additional language is that it makes the construction more complete in the context of the invention as claimed by Claim 30.  For reasons already discussed, the Court is not persuaded by Dealix's argument.  Furthermore, the Court is separately construing the terms "product identification data" and "buyer location information."  If necessary, these separate constructions by the Court can address from where "product identification data" and "buyer location information" originate.  Accordingly, the Court does not construe the function to include the phrase "received from a potential buyer."

The parties and the Court agree that the corresponding structure should be construed as "Data Center server (element 104 in Figure 1 and components of the server illustrated in Figure 6 including elements 604 process purchase request module, 608 database access module, 610 buyer-dealer association module and 612 network access module) working in conjunction with the system database (element 106 in Figure 1) to execute a computer program implementing the steps as shown at least in Figure 10."

15

*Means for identifying in response to said comparing means at least one of said dealers to notify*

The parties do not dispute that this limitation should be construed as a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6.  The Court agrees with Dealix and construes the function as "identifying in response to said comparing means at least one of said dealers to notify."  Autobytel argues that the function should be construed as "identifying . . . at least one of said dealers to notify."  Autobytel does not offer any support from the specification or otherwise to indicate why the phrase "in response to said comparing means" should not be included as part of the function.  The Court agrees with Dealix that Autobytel's construction is incomplete.  The claimed means is not merely to identify at least one dealer to notify, but to make that identification in response to the comparing means.  Therefore, the "in response to said comparing means" language is part of the function of "identifying . . . at least one of said dealers to notify."  Accordingly, the Court adopts Dealix's proposed function.

The parties and the Court agree that the corresponding structure should be construed as "Data Center server (element 104 in Figure 1 and components of the server illustrated in Figure 6 including element 604 process purchase request module, 608 database access module, 610 buyer-dealer association module) working in conjunction the system database (element 106 in Figure 1) to execute a computer program implementing the steps as shown at least in Figure 10."

*Means for creating a purchase request record*

The parties do not dispute that this limitation should be construed as a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6.  The parties and the Court agree that the function should be construed as "creating a purchase request record."  Furthermore, the parties and the Court agree that

16

the corresponding structure should be construed as "Data Center server (element 104 in Figure 1 and components of the server illustrated in Figure 6 including elements 604 process purchase request module, 608 database access module, 610 buyer-dealer association module, 614 network access module) working in conjunction with the system database (element 106 in Figure 1) to execute a computer program implementing the steps as shown at least in Figure 10."

*Means for communicating said purchase request record*

The parties do not dispute that this limitation should be construed as a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6.  The parties and the Court agree that the function should be construed as "communicating said purchase request to said identified dealer."

The Court agrees with Autobytel and construes the corresponding structure as "Data Center server (elements 104 and 110 in Figure 1 and components of the server illustrated in Figure 6 including elements 604 process purchase request module, 608 database access module, 612 dealer access module, 614 network access module) working in conjunction with the system database (element 106 in Figure 1) and the dealer computers (element 120 in Figure 1) and network (elements 102, 110) to execute a computer program implementing the steps as shown at least in Figure 10." As with the means for receiving claim, Dealix proposes the same corresponding structure as Autobytel with the one exception.  Dealix adds "gateway" to the corresponding structure based on its presence in Figure 1.  As mentioned above, "gateway" is only present as a component to "one embodiment" of the invention.  *See* Col. 3:52-53, Col. 6:1-8.  There is no indication that "gateway" is part of the only embodiment or that it is required to perform the recited function.  *See* Col. 3:52-53.  Accordingly, the Court does not include "gateway" as part of the corresponding structure.

### *Means for refreshing*

The parties do not dispute that this limitation should be construed as a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6.  The parties and the Court agree that the function should be construed as "refreshing said list to include a new purchase request."

The Court agrees with Autobytel and construes the corresponding structure as "dealer computers (element 120 in Figure 1 and components associated with a browser application as illustrated in Figure 17) working in conjunction with Data Center server (element 104 illustrated in Figure 1 and Figure 6) and the network (elements 102 and 110 in Figure 1)."  Again, Dealix includes the "gateway" as part of the corresponding structure based on its presence in Figure 1.  For the same reasons mentioned above, the Court does not include the "gateway" as part of the corresponding structure.

### *Means for sending an email message to an email paging service*

The parties do not dispute that this limitation should be construed as a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6.  The Court agrees with Dealix and construes the function as "sending an email message to an email paging service."  Autobytel argues that the function should be construed as "sending an email message" excluding the phrase "to an email paging service." Autobytel does not offer any support from the specification or otherwise to indicate why the phrase "to an email paging service" should not be included as part of the function.  The function was drafted to include a specific destination for the email message and to construe the function without such destination would impermissibly broaden the scope of the function.  Accordingly, the Court is not persuaded that the language should be excluded.

The parties and the Court agree that the corresponding structure should be construed as

18

"dealer computers (element 120 in Figure 1 and components associated with a browser application as illustrated in Figure 17) working in conjunction with Data Center server (element 104 illustrated in Figure 1 and Figure 6) and the network (elements 102, 110 in Figure 1)."

## MOTION TO STRIKE

The parties agreed in their Joint Claim Construction and Prehearing Brief ("Joint Statement") that each party reserved the right to designate expert witnesses after the prehearing conference.  The parties did not indicate a deadline by which the designation of expert witnesses was to occur.  The Court does expects compliance with Court imposed deadlines and does not approve of parties changing Court imposed deadlines without approval from the Court.  The Court expects all parties to provide a full and timely disclosure of both the identity and opinions of any expert witness in accordance with the local rules.  Furthermore, any intentional delay in providing such information to an opposing party is unacceptable.

In the present situation, where the parties agreed to modify the relevant deadline but neither received the Court's approval nor provided an alternative deadline, it is difficult for the Court to determine if Dealix acted unreasonably, untimely, or in bad faith in disclosing information related to Dr. Korth.  Dealix was apparently willing to allow Autobytel additional time to conduct discovery related to Dr. Korth.  Due to the parties' agreement on the matter and concessions offered by Dealix to lessen any surprise suffered by Autbytel, Autobytel does not appear to have suffered unfair surprise with respect to the Korth declaration.  Furthermore, although the Court considered Dr. Korth's Declaration, his opinions do not substantively affect the Court's claim construction opinion. Accordingly, the Court **DENIES** Autobytel's motion.

## CONCLUSION

For the foregoing reasons, the Court interprets the claim language in this case in the manner set forth above.  For ease of reference, the Court's claim interpretations are set forth in a table as Appendix B.  The claims with the disputed terms in bold are set forth in Appendix A.

For the reasons set forth above, the Court **DENIES** Autobytel's Motion to Strike the Korth Declaration.

**So ORDERED and SIGNED this 18th day of January, 2006.**

_____
**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

# APPENDIX A

# U.S. PATENT NO. 6,282,517

What is claimed is:

**1.** A method of communicating a **purchase request** to a dealer in a **Data Center system** having a **system database**, a **buyer interface**, and a **dealer interface**, wherein said **buyer interface** and dealer interface provide a **remote interface** to said Data Center, said **buyer interface** and dealer interface provide **immediate access** to said **system database**, said method comprising the acts of:

creating an **exclusive database region** for each of a plurality of participating dealers in said **system database**;

providing each of said plurality of dealers **direct access** to said **exclusive database region** over a **computer network**, wherein said access is through said **dealer interface**;

receiving said **purchase request** over a computer network from a **potential buyer**, said **purchase request** including **product identification data** and **buyer location information**;

comparing said **product identification data** and said **buyer location information** with at least one of a plurality of records that are associated with at least one of said plurality of dealers;

identifying in response to said step of comparing at least one of said plurality of dealers to notify;

**creating a purchase request record** for said **purchase request**; and

**communicating said purchase request** to said identified dealer, said communicating includes storing said **purchase request record** into said **exclusive database region** for said identified dealer **immediately** upon creation of said **purchase request record**, and wherein said **purchase request** is accessed by the identified dealer via at least one **web page** that is provided by a **server that is remote to the identified dealer**.

**2.** The method as defined in claim **1** wherein said act of receiving said **purchase request** comprises receipt of a request that is transmitted through a plurality of **web pages**.

**3.** The method as defined in claim **1**, wherein said **product identification data** includes a vehicle make and a vehicle model.

**4.** The method as defined in claim **1**, wherein said **purchase request records** is either a new vehicle **purchase request record** or a used vehicle **purchase request record**.

**5.** The method as defined in claim 1, wherein said dealer identification is based on a vehicle make specified in said **product identification data** and a zip code specified in said **buyer location information**.

**6.** The method as defined in claim 1, wherein said dealer identification is based on a search of a used vehicle inventory for a vehicle specified in said **product identification data**.

**7.** The method as described in claim **6**, wherein said search is further based on both a buyer search radius and a dealer search radius.

**8.** The method as defined in claim 1, wherein said dealer identification is based on an **identification number**.

**9.** The method as defined in claim 1, wherein said act of communicating includes the act of adding a new vehicle **purchase request record** to a new vehicle **purchase requests** field in a **dealer record** associated with said identified dealer.

**10.** The method as defined in claim **1**, wherein said act of communicating includes the act of adding a used vehicle **purchase request record** to a used vehicle **purchase requests** field in a dealer record associated with said identified dealer.

**11.** The method as defined in claim **1**, wherein said act of communicating includes the act of adding a new vehicle **purchase request record** to a list of new vehicle **purchase request records**.

**12.** The method as defined in claim **1**, wherein said act of communicating includes the act of adding a used vehicle **purchase request record** to a list of used vehicle **purchase request records**.

**13.** The method as defined in claim **1**, wherein said act of communicating includes the act of setting a dealer **identification number** field to a dealer **identification number** for said identified dealer.

**14.** The method as defined in claim **1**, wherein said act of communicating includes the acts of:  **displaying** a list of **purchase requests** to said identified dealer; and **refreshing** said list to include a new **purchase request immediately** upon the creation of said new **purchase request.**

**15.** The method as defined in claim **1**, wherein said act of communicate includes sending an e-mail message to an e-mail message paging service.

**16.** The method as defined in claim **1**, wherein said act of communicating includes **logically connecting** a new **purchase request record** to a dealer record.

**17.** The method as described in claim **1**, further comprising the act of receiving only one new vehicle **purchase request** from said buyer within a 48 hour period.

**18.** A **purchase request** communication system, wherein said **purchase request** is remotely entered by a potential buyer over a computer network, said **purchase request** communication system comprising:  a **system database** which provides an **exclusive database region** for each of a plurality of dealers;

an **entry system** which creates said **purchase request**, and which **provides at least a first web page to said buyer**;

a **dealer management system** which provides said plurality of dealers **remote access** into said **exclusive database region** via using at least a second **web page**; and

a **processing system** which creates a **purchase request record** for said **purchase request**, said processing system identifying

21

which of a plurality of dealers based on said **purchase request**, said processing system **immediately storing** said **purchase request record** in said **exclusive database region** for said identified dealer.

19. The **purchase request** communication system as defined in claim **18,** wherein said **purchase request record** is either a new vehicle **purchase request record** or a used vehicle **purchase request record**.

20. The **purchase request** communication system as defined in claim **18,** wherein said dealer identification is based on a vehicle make and a zip code specified in said **purchase request**.

21. The **purchase request** communication system as defined in claim **18,** wherein said dealer identification is determined in response to a search of a used vehicle inventory for a vehicle specified in said **purchase request**.

22. The method as described in claim **21,** wherein said search is further based on both a buyer search radius and a dealer search radius.

23. The **purchase request** communication system as defined in claim **18,** wherein said dealer identification is determined in response to an **evaluation of an identification number**.

24. The **purchase request** communication system as defined in claim **18,** wherein said communication system communicates said **purchase request** to said dealer by adding a new vehicle **purchase request record** to a new vehicle **purchase requests** field in a dealer record associated with said dealer.

25. The **purchase request** communication system as defined in claim **18,** wherein said communication system communicates said **purchase request** to said dealer by adding a used vehicle **purchase request record** to a used vehicle **purchase requests** field in a dealer record associated with said dealer.

26. The **purchase request** communication system as defined in claim **18,** wherein said communication system communicates said **purchase request** to said dealer by adding a new vehicle **purchase request record** to a list of new vehicle **purchase request records**.

27. The **purchase request** communication system as defined in claim **18,** wherein said communication system communicates said **purchase request** to said dealer by adding a used vehicle **purchase request record** to a list of used vehicle **purchase request records**.

28. The **purchase request** communication system as defined in claim **18,** wherein said communication system communicates said **purchase request** to said dealer by setting a dealer **identification number** field to a dealer identification number for said identified dealer..

29. The **purchase request** communication system as defined in claim **18,** wherein said communication system communicates said **purchase request** to said dealer by sending an e-mail message to an e-mail message paging service.

30. A **purchase request** communication system for communicating to at least one of a plurality of dealers a **purchase request** submitted by a **potential buyer**, said communication system having a **system database**, a **buyer interface**, and a **dealer interface**, said **system database** including an **exclusive database region** for each of said plurality of dealers, said communication system comprising:

**means for receiving** a **purchase request** over a computer network from a potential buyer, said **purchase request** including at least a **product identification data** and a **buyer location information**;

**means for comparing** said **product identification data** and said **buyer location information** with at least one of a plurality of records that are associated with at least one of said plurality of dealers;

**means for identifying** in response to said comparing means at least one of said dealers to notify;

**means for creating** a **purchase request record** for said **purchase request**; and

**means for communicating** said **purchase request** to said identified dealer, said communicating includes storing said **purchase request record** into said exclusive database region for said identified dealer **immediately** upon said **formulating** said **purchase request record**, and wherein said **purchase request** is accessed by the identified dealer via at least one web page that is provided by a **server that is remote to the identified dealer**.

31. The communication system as defined in claim **30,** additionally comprising:  **means for displaying** a list of **purchase requests** to said identified dealer; and **means for refreshing** said list to include a new **purchase request immediately** upon tie creation of said new **purchase request**.

32. The communication system as defined in claim **30,** additionally comprising **means for sending an e-mail message to an e-mail message paging service**.

33. The communication system as defined in claim **30,** wherein said dealer identification is based on both a buyer provided search radius and a dealer provided search radius.

## APPENDIX B

### CLAIMS CONSTRUCTION FOR US PATENT NO. 6,282,517

| Claim Language | Court's Construction |
|---|---|
| **Purchase Request**<br><br>Claims 1, 2, 9, 10, 14, 17, 18, 19, 20, 21, 23, 24, 25, 26, 27, 28, 29, 30, 31 | information concerning a potential purchase transaction submitted by a potential buyer and received by a Data Center system |
| **Data Center system**<br><br>Claim 1 | the system defined by the claims of the patent-in-suit |
| **System database**<br><br>Claim 1 | a database in the Data Center system |
| **Buyer interface**<br><br>Claims 1, 30 | a hardware/software module used by a potential buyer to submit a purchase request to the Data Center system |
| **Dealer interface**<br><br>Claims 1, 30 | a hardware/software module used by a dealer to access the Data Center system |
| **Remote interface**<br><br>Claim 1 | interface to provide remote access to the Data Center |
| **Immediate access**<br><br>Claim 1 | the ability of the buyer interface and dealer interface to immediately find and go to a database |
| **Computer network**<br><br>Claims 1, 18, 30 | two or more computers interconnected to enable communication among them |
| **Exclusive database region**<br><br>Claims 1, 18, 30 | the collection of all purchase request records in the system database associated with a particular dealer for its exclusive access |
| **Direct access**<br><br>Claim 1 | the ability of a computer to find and go straight to a particular storage location in memory or on disk to retrieve or store an item of information |

| | |
|---|---|
| **Product identification data**<br><br>Claims 1, 3, 5, 6, 30 | information displayed to and/or submitted by a potential buyer that identifies a product sought to be purchased |
| **Buyer location information**<br><br>Claims 1, 5, 30 | no construction needed |
| **Creating a purchase request record**<br><br>Claims 1, 30 | no construction needed |
| **Communicating said purchase request**<br><br>Claims 1, 30 | no construction needed |
| **Displaying**<br><br>Claims 14, 31 | making visible |
| **Refreshing**<br><br>Claims 14, 31 | updating information on a display |
| [storing said purchase request record  into said exclusive database region] **…Immediately** [upon creating of said purchase request record] | no construction needed |
| **Web page**<br>Claims 1, 2, 18, 30 | a collection of data formatted in a markup language with hypertext capabilities |
| **Server that is remote to the identified dealer**<br><br>Claims 1, 30 | server distant from the dealer.  Server:  a device or computer system that is dedicated to providing specific facilities to other devices attached to the computer network |
| **Entry system**<br>Claim 18 | hardware/software module that enables the input of information |
| **Provides at least a first web page to said buyer**<br><br>Claim 18 | hardware/software module that produces the web page through which a potential buyer creates and submits a purchase request |

24

| | |
|---|---|
| **Dealer management system**<br><br>Claim 18 | hardware/software module that enables a dealer to manage information |
| **Remote access**<br><br>Claim 18 | access from a physically distant computer |
| **Immediately storing [said purchase request record]**<br><br>Claim 18 | no construction needed |
| **Formulating**<br><br>Claim 30 | creating |
| **Logically connecting**<br><br>Claim 16 | establishing a link between |
| **Purchase request record**<br><br>Claims 1, 4, 9, 10, 11, 12, 16, 18, 19, 24, 25, 26, 27, 30 | a collection of fields populated by dealer information and buyer information |
| **Identification number**<br><br>Claims 8, 13, 23, 28 | no construction needed |
| **Means for receiving a purchase request** | **Function**:  receiving a purchase request over a computer network<br><br>**Structure**: Data Center server (element 104 in Figure 1 and components of the server illustrated in Figure 6 including elements 602  buyer access module and element 604 process purchase request module and 612 network access module) working in conjunction with buyer computers (element 116/118 in Figure 1) to execute a computer program implementing at least the steps as shown in Figure 10. |

| **Means for comparing said product identification data and said buyer location information** | **Function**:  comparing said product identification data and said buyer location information<br><br>**Structure**:  Data Center server (element 104 in Figure 1 and components of the server illustrated in Figure 6 including elements 604 process purchase request module, 608 database access module, 610 buyer-dealer association module and 612 network access module) working in conjunction with the system database (element 106 in Figure 1) to execute a computer program implementing the steps as shown at least in Figure 10. |
|---|---|
| **Means for identifying in response to said comparing means at least one of said dealers to notify** | **Function:**  identifying in response to said comparing means at least one of said dealers to notify<br><br>**Structure**:  Data Center server (element 104 in Figure 1 and components of the server illustrated in Figure 6 including element 604 process purchase request module, 608 database access module, 610 buyer-dealer association module) working in conjunction the system database (element 106 in Figure 1) to execute a computer program implementing the steps as shown at least in Figure 10. |
| **Means for creating a purchase request record** | **Function**:  creating a purchase request record<br><br>**Structure**:  Data Center server (element 104 in Figure 1 and components of the server illustrated in Figure 6 including elements 604 process purchase request module, 608 database access module, 610 buyer-dealer association module, 614 network access module) working in conjunction with the system database (element 106 in Figure 1) to execute a computer program implementing the steps as shown at least in Figure 10. |
| **Means for communicating said purchase request record** | **Function**:  communicating said purchase request to said identified dealer<br><br>**Structure**:  Data Center server (elements 104 and 110 in Figure 1 and components of the server illustrated in Figure 6 including elements 604 process purchase request module, 608 database access module, 612 dealer access module, 614 network access module) working in conjunction with the system database (element 106 in Figure 1) and the dealer computers (element 120 in Figure 1) and network (elements 102, 110) to execute a computer program implementing the steps as shown at least in Figure 10. |

| **Means for refreshing** | **Function**:  refreshing said list to include a new purchase request<br><br>**Structure**:  dealer computers (element 120 in Figure 1 and components associated with a browser application as illustrated in Figure 17) working in conjunction with Data Center server (element 104 illustrated in Figure 1 and Figure 6) and the network (elements 102 and 110 in Figure 1) |
|---|---|
| **Means for send an email message to an email paging service** | **Function**:  sending an email message to an email paging service<br><br>**Structure**:  dealer computers (element 120 in Figure 1 and components associated with a browser application as illustrated in Figure 17) working in conjunction with Data Center server (element 104 illustrated in Figure 1 and Figure 6) and the network (elements 102, 110 in Figure 1) |